## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATALIE BRAHM, JAMES QUAID, JANE
DOE, KIM WARD, & SUE BORNEMANN,

        Plaintiffs,

   v.

                                 Case No. 3:23-cv-444

HOSPITAL SISTERS HEALTH SYSTEMS,

SACRED HEART HOSPITAL OF THE
HOSPITAL SISTERS OF THE THIRD
ORDER OF ST. FRANCIS,

PREVEA HEALTH SERVICES, INC.,

and

PREVEA HEALTH NETWORK, INC.,

        Defendants.

---

### AMENDED CLASS ACTION COMPLAINT

---

Natalie Brahm, James Quaid, Jane Doe, Kim Ward, and Sue Bornemann ("Plaintiffs"),

through their attorneys, individually and on behalf of all other current Wisconsin citizens similarly

situated ("Class Members"), bring this Class Action Complaint against Defendants Hospital

Sisters Health System, Sacred Heart Hospital of the Hospital Sisters of the Third Order of Saint

Francis (together "HSHS" or "Hospital Sisters") and Defendants Prevea Health Services, Inc., and

Prevea Health Network, Inc. (together "Prevea"), and their present, former, or future direct and

indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs

allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.      Defendant Hospital Sisters systematically violates its patients' medical privacy rights, exposing their highly sensitive personal information to third parties without their knowledge or consent. In particular, Hospital Sisters exposes its patients' personal identifiable information and protected health information (together "PII/PHI").

2.      Defendant Hospital Sisters ("Hospital Sisters" or "HSHS") has legal duties to keep its patients' PII/PHI confidential.  As such, HSHS is prohibited from disclosing its patients' PII/PHI to third parties without their knowledge, consent, or authorization.

3.      Hospital Sisters recognizes its duties and assures visitors to its website that "Federal law requires Hospital Sisters Health System (HSHS)and our health care providers to maintain the privacy of your Protected Health Information (PHI)."[1] Hospital Sisters further promises that "We will obtain your authorization before using your PHI for marketing or sales purposes."[2]

4.      These assurances are false and misleading. In reality, Hospital Sisters disregards its duties, internal policies, and the laws that prohibit disclosures of patient PII/PHI.

5.      At all relevant times, Hospital Sisters has disclosed its patients' PII/PHI—including their status as patients, their providers, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties. Worse, Hospital Sisters did this without its patients' knowledge, authorization, or consent.

---

[1] https://www.hshs.org/HSHS/notice-of-privacy-practices
[2] https://www.hshs.org/HSHS/notice-of-privacy-practices

6.      Hospital Sisters routinely discloses such PII/PHI by using various digital marketing and automatic rerouting tools on its website. Via these tools, Hospital Sisters purposefully and intentionally discloses its patients' PII/PHI to third parties. In turn, these third parties exploit that information, and use it for advertising. By using these tools, Hospital Sisters takes its patients' confidential communications and PII/PHI and automatically sends them to Facebook, Google, and other third parties—a clear violation of its patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Wisconsin and Illinois, and Hospital Sisters' express and implied promises.

7.      In addition, Prevea Health Systems ("Prevea") (together with HSHS, "Defendants") is a healthcare services corporation formed in partnership with HSHS, and the companies own Prevea 50% each. They also share an electronic medical record system that misused the Facebook Meta Pixel, Universal Analytics tracker through Google, Google Analytics, and Firebase code systems to track and disclose patient PHI and PII to Google without patient consent. In just this same way, Prevea violated the privacy rights belonging to patients throughout Wisconsin.

8.      Defendants' unauthorized disclosures violate Wisconsin and Illinois law. Moreover, through its unauthorized disclosures, Defendants breached implied contracts, breached its fiduciary duties, was unjustly enriched, and committed the torts of conversion and invasion of privacy. And, as courts are finding across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and its economic value in the marketplace. Doe v. Virginia Mason Medical Center, 2024 Wash. Super. WL 3517759 ("If it did not have value, then entire industries that sell and trade this data would not exist").

## PARTIES

9.     Plaintiff, Natalie Brahm, is a natural person and citizen of Wisconsin. She resides in Elkhorn, Wisconsin where she intends to remain.

10.     Plaintiff James Quaid is a natural person and citizen of Illinois. He resides in Illinois and intends to remain there.

11.     Plaintiff Jane Doe is a natural person and citizen of Illinois. She resides in Illinois and intends to remain there.

12.     Plaintiff Kim Ward is a natural person and citizen of Wisconsin. She resides in Wisconsin and intends to remain there.

13.     Plaintiff Sue Bornemann is a natural person and citizen of Wisconsin. She resides in Wisconsin and intends to remain there

14.     Defendant, Hospital Sisters Health System is an Illinois non-stock corporation with its principal place of business at 4936 Laverna Road, Springfield, Illinois 62707.  It may be served by serving its registered agent, Larry Michael Gille Esq, 2710 Executive Drive, PO Box 19070, Green Bay, WI 54307.  HSHS operates multiple hospitals and scores of community-based health centers and clinics throughout Wisconsin, including HSHS St. Vincent Hospital in Green Bay, Wisconsin, HSHS Sacred Heart Hospital in Eau Claire, Wisconsin, HSHS St. Joseph's in Chippewa Falls, Wisconsin, HSHS St. Mary's Hospital in Green Bay, Wisconsin, HSHS St. Nichols Hospital in Sheboygan, Wisconsin, and HSHS St. Clare Memorial Hospital in Oconto Falls, Wisconsin. In addition, HSHS operates over 90 hospitals, clinics, and labs in Illinois, including those visited by Plaintiffs in this action.

15.     Defendant Sacred Heart Hospital of the Hospital Sisters of the Third Order of St. Francis ("Hospital Sisters Sacred Heart Hospital") is a Wisconsin non-stock corporation with its

principal place of business at 900 West Clairemont Avenue, Eau Claire, WI 54701. It may be served by serving its registered agent, Larry Gille, 2710 Executive Drive, Green Bay, WI 54304.

16.     Defendant, Prevea Health Services, Inc., is a Wisconsin corporation with its principal place of business located at 2710 Executive Dr., Green Bay, Wisconsin 54304. Its registered agent is Larry Gille, who maintains an office at the same address.

17.     Defendant, Prevea Health Network, Inc., is a Wisconsin corporation with its principal place of business located at 2710 Executive Dr., Green Bay, Wisconsin 54304. Its registered agent is Larry Gille, who maintains an office at the same address.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this matter. In July 2023, HSHS removed this action from Wisconsin state court to this Court under CAFA, 28 U.S.C. § 1332(d). Under its provisions, jurisdiction exists because the class has at least 100 members, the citizenship of one class member is different from the Defendants, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. Further, federal question jurisdiction exists because Plaintiffs assert a claim under the Federal Wiretapping Act. *See* 28 U.S.C. § 1331.

19.     Personal jurisdiction exists over Defendants because they are registered to do business in Wisconsin, conducted substantial activities related to the issues at stake here, and has purposefully availed themselves of the privilege to do business here. Further, HSHS voluntarily removed the action to this Court, waiving any challenged to this Court's jurisdiction over HSHS.

20.     Venue is proper under 28 U.S.C. § 1441(a) because the removed action originated in Eau Claire County, a court encompassed by the Western District. Further, a substantial part of the events or omissions giving rise to the claim occurred in this District.

# BACKGROUND

## A.     Plaintiffs' experiences with Defendants

21.     Plaintiff Natalie Brahm is an active Facebook user and has had an account since approximately 2015. Plaintiff Natalie Brahm is a patient of HSHS and has received specialized medical services from HSHS, including at Hospital Sisters Sacred Heart Hospital in Eau Claire, Wisconsin.

22.     In 2021, Plaintiff Natalie Brahm used HSHS's website to pay hospital bills and obtain treatment information.  She similarly used HSHS's patient portal almost daily between May 2021 and November 2021.  During her interactions with HSHS's website and patient portal, Plaintiffs entered sensitive medical information, such as details about her medical condition and doctor.  The information that Plaintiff transmitted included, among other things, queries related to fertility treatments that Plaintiff was receiving from HSHS.

23.     Plaintiff James Quaid is an active Facebook user and has had an account since approximately 2009. Plaintiff Quaid is a patient of HSHS at an Illinois location and has received specialized treatment for diabetes, high blood pressure, and primary care.

24.     Plaintiff Quaid has been using HSHS's website services for around six years, including within the last few weeks. He uses the website to access HSHS's patient portal and search for physicians specializing in the treatments for his diagnoses. He also uses the hospital's website to schedule appointments and research treatments. When doing so, he enters identifying information and information related to his medical conditions like diabetes and high blood pressure—information that was transmitted with personally identifying information to third party advertisers without his consent. In fact, he has received Facebook advertisements related to treatments for diabetes and high blood pressure.

6

25.     Plaintiff Jane Doe is an active Facebook user and has had an account for several years. She is a patient with HSHS, St. Joseph's, and has been for around 10 years.

26.     For several years, Plaintiff Doe has used HSHS's website and patient portal to facilitate her care, including to find a podiatrist to treat foot and ankle conditions and a general practitioner for primary care. She has also used HSHS's web properties to schedule appointments. When doing so, she enters identifying information and information related to her medical treatments like podiatry—information that was transmitted with personally identifying information to third party advertisers without her consent. In fact, she has received Facebook advertisements related to doctors offering such treatment in her area.

27.     Plaintiff Kim Ward used Prevea's website and patient portal to search for specialists, research treatments, book appointments, and access medical records and information through the portal. This includes facilitating care for her mental health and cardiology treatments, using Prevea's website and portal often over the past 10 years. Plaintiff Ward is a Google user and Facebook member, having accessed Prevea's web properties using Google Chrome. Since using these resources, Plaintiff Ward has received advertisements targeted at her medical conditions, including advertisements on Facebook related to mental health treatments and heart medications.

28.     Plaintiff Suzette (Sue) Bornemann used Prevea's website and patient portal to search for specialists, research treatments, book appointments, pay bills, and access medical records and information through the portal. This included facilitating care for her primary and specialty care, and neurological treatments—using Prevea's website and portal to do so since 2013. Plaintiff Bornemann is a Google user and Facebook member, having accessed Prevea's web properties using Firefox, Google Chrome, Explorer. Since using these resources, Plaintiff

Bornemann has received advertisements targeted at her medical conditions, including advertisements on Facebook related to neurological treatments.

29.    Plaintiffs believed that their interactions with Defendants' websites and portals were private and would not be shared with anyone besides their health care providers and their staff.  Plaintiffs were dismayed when they learned that their personal health information had been sent to Facebook and Google without their consent.

**B.    Defendants routinely disclose patient PII/PHI to third parties like Google and Facebook.**

30.    As Hospital Sisters and Prevea recognize, healthcare systems have a duty to refrain from making unauthorized disclosures to third parties about their patients' nonpublic medical information.

31.    Patients are aware of the promises of confidentiality contained within the Hippocratic Oath and are guarded against unauthorized disclosures of their private medical information by statutory, regulatory, and common law protections afforded them under the law.

32.    Patients rely on these promises, obligations, and protections when seeking medical care.

33.    Medical patients in Wisconsin and Illinois like Plaintiffs and the Class have legal interests in preserving the confidentiality of their communications with healthcare providers.

34.    Patients also have reasonable expectations of privacy that their PII/PHI and communications will not be disclosed to third parties without their express written consent and authorization.

35.    As health care providers, Defendants have fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

36.     Defendants expressly and impliedly promise patients that they will maintain and protect the confidentiality of patient PII/PHI and communications.

37.     Defendants operate websites for patients, including www.hshs.org and prevea.com.

38.     Defendants' websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

39.     Defendants encourage patients to use digital tools on its websites to seek and receive health care services.

40.     The home page of Defendants' websites are designed for use by patients. The homepage provides patients with tools to seek medical treatment, such as finding a doctor, researching services and treatments, and paying bills.

41.     Defendants also maintain a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with health care providers.  Source code on Defendants' websites causes these communications to be intercepted and disclosed to multiple third parties, including Google and Facebook.

42.     Notwithstanding patients' reasonable expectations of privacy, Defendants' legal duties of confidentiality, and Defendants' express promises to the contrary, Defendants discloses the contents of patients' communications and PII/PHI via automatic data collection mechanisms embedded in the websites operated by Defendants without patients' knowledge, authorization, or consent.  In doing so, Defendants systematically violated the medical privacy rights of they patients by causing the unauthorized disclosure of patient communications to be transmitted to third-party marketing companies like Google and Facebook.

43.    Plaintiffs and Class Members provided their private information to Defendants' website with the reasonable understanding that Defendants would secure and preserve the confidentiality of that information.

44.    The private information provided by Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties utilizing the information for retargeting.

45.    While Defendants intentionally incorporated tracking mechanisms into their websites, Defendants never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications with Facebook, Google, and other third parties.  As a result, Plaintiffs and Class Members were unaware that their private information was being surreptitiously transmitted to Facebook when they visited Defendants' website.

46.    The tracking mechanisms that Defendants use on their websites are—by design— invisible to patients.

47.    Defendants did not warn or otherwise disclose to Plaintiffs and Class Members that Defendants bartered their confidential medical communications to Facebook, Google, and other third parties for marketing purposes.

48.    Plaintiffs and Class Members never consented, agreed, or otherwise authorized Defendants to disclose their confidential medical communications, particularly not beyond the limits of Defendants' express promises to protect the confidentiality of Plaintiffs' and Class Members' private information.

49.    Upon information and belief, Defendants intercepted and disclosed the following non-public private information to third parties including Google and Facebook:

        a.       Plaintiffs' and Class Members' status as patients;

b.      Plaintiffs' and Class Member's communications with Defendants via its website;

c.      Plaintiffs' and Class Members' use of Defendants' patient portals;

d.      Plaintiffs' and Class Member's searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

50.     Defendants interfered with Plaintiffs' and Class Members' privacy rights when they implemented technology (including the Meta Pixel) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential information to Facebook, Google, and other third parties.

51.     Defendants also breached their obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their private information to third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' private information to third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Defendants were routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Defendants' common and statutory obligations to protect the confidentiality of patient's protected health information.

52.     Plaintiffs and Class Members have suffered injury because of Defendants' conduct. Their injuries include  invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

11

**C.    Defendants misuse sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.**

53.    Defendants' disclosures of patients' PII/PHI occur because Defendants intentionally deploy source code on the websites it operates, including https://www.hshs.org, that cause patients' PII/PHI (as well as the exact contents of their communications) to be transmitted to third parties.

54.    By design, these third parties receive and record the exact contents of patient communications before the full response from Defendants to patients has been rendered on the screen of the patient's computer device and while the communication between Defendants and the patient remains ongoing.

55.    For example, when Plaintiffs or a Class Member accessed Defendants' website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers.  The information that Defendants sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendants' website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing.  Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

56.    Websites like those maintained by Defendants are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

57.     Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

58.     Web browsers are software applications that allow users to exchange electronic communications over the internet.

59.     Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to display in the client device's web browser.

60.     In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

61.     In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. A web page's source code is a set of instructions that commands browsers to take certain actions, either when the web page loads or when a specified event triggers the code.

62.     For example, typing https://www.hshs.org into a browser sends an HTTP request to HSHS's website, which returns a HTTP response in the form of the home page of HSHS's website:



63.     Source code is not visible on the user device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the user device's screen.  Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or as is the case with Defendants' website, to third parties via pixels.

64.     For example, HSHS's website includes software code that transmits HTTP requests *directly* to Facebook, including patients' PII/PHI, every time a patient interacts with a page on its website.

65.     The basic command that web browsers use to exchange data and user communications is called a GET request.[3]  For example, when a patient types "heart failure treatment" into the search box on Defendants' website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendants' website and sends the following request: "GET search/q=heart+failure+treatment."

---

[3] https://www.w3schools.com/tags/ref_httpmethods.asp.

66.     When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user.  For example, if a patient enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

67.     The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

68.     In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

69.     Once the initial connection is made between a user and a website, the communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

70.     Unbeknownst to users, however, the website's server may also redirect the user's communications to third parties via third-party tracking tools. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[4]

---

[4] https://support.google.com/platformspolicy/answer/6156630?hl=en.

71.    Third parties (such as Facebook and Google) may use the information they receive to track user data and communications for marketing purposes.

72.    In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

73.    Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom users' personally identifiable data and communications are transmitted without their knowledge or consent.

74.    Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

75.    Defendants deploys Google Tag Manager on their websites through an "iframe," a nested "frame" that exists within the Defendants' website that is, in reality, an invisible window through which Defendants funnel tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

76.    Defendants' Google Tag Manager source code is designed to be invisible.  The source code employed by Defendants specifies an "iframe" with a height of 0, width of 0, display of none, and visibility hidden.

77.    Defendants then funnel invisible 1x1 tracking pixels or web-bugs through this purposely invisible iframe to help third parties track, acquire, and record patient data and communications.

78.     By design, none of the tracking is visible to patients visiting Defendants' websites.

79.     Tracking pixels can collect dozens of data points about individual website users who interact with a website.  For example, when a patient clicks through HSHS's website to the page describing Defendants' "Cancer Care" services at https://www.hshs.org/Sacred-Heart/Services/Cancer-Care/Your-Cancer-Care-Team, the source code deployed on Defendants' website causes the patient's PII/PHI and the content of their communications to be transmitted to third parties, including Facebook, Google Analytics, Google Tag Manager, and Google Double Click:



80.     By design, the transmission of patient data to third parties occurs before Defendants' responsive communications about "cancer care" services have been delivered in full to the patient.

81.     In addition to the Google Tag Manager, other source code is also placed on Defendants' websites, resulting in the interception and transmission of patient PII/PHI to multiple third parties.

17

82.    A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

83.    For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

84.    Tracking pixels such as the Meta Pixel tool allow Defendants and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendants' websites.  When patients visit Defendants' websites, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendants' websites.  This code is triggered when a patient or visitor interacts with the web page.  Each time the Meta Pixel is triggered, the software code is executed and sends patient's PII/PHI directly to Facebook.

85.    The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed.  Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

86.    For example, a patient can trigger an HTTP request by interacting with the search bar on Defendants' websites by typing a term such as "breast cancer" into the search bar and then hitting enter.  Defendants' servers in turn send an HTTP response, which results in the search results being displayed.

87.    This is not the only HTTP request, however, that is created by a patient's interaction with Defendants' website.  In fact, at the very same time the web page is instructed to send an HTTP request to Defendants requesting search results, the embedded source code, acting as a tap, is triggered, such that Defendants' websites are also instructed to send an HTTP request directly to Facebook, Google, and other third parties informing them of the patient's exact search and the patient's identifiable information.

88.    Defendants also offer mobile apps for download to the public via their websites. On information and belief, Defendants incorporated Google Firebase Code into the mobile patient portal apps that they offered to the public.

89.    Google Firebase Code is a free software development kit ("SDK") that Google offers to developers to help them build and monetize mobile applications.  Google, however, uses this embedded code to surveil users on non-Google apps.  Software libraries included within the Firebase SDK code enable Google to collect information such as a user's age bracket, gender, interests, device brand, device category, location, operating system, and other information regarding users' interactions with the app.  Google Firebase code also allows Google to track text that users type into an app; track results of users' searches within an app; and track users' downloads of files within an app.  Unbeknownst to Plaintiffs and patients, the installation of this code inside the Defendants' patient portal apps resulted in disclosures of patients' personal health information, including their patient status, whenever they logged into the app and used it for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors.

90.     At minimum, HSHS used tracking technologies without patient consent across the following web properties: hshs.org, myhshs.org, prevea.com, myprevea.com, pcinmd.org, praarieheath.org, previarejuvenate.com, docasap.com, and prevea.zipnosis.com.

**D.    Prevea tracks and discloses patient PHI and PII without patient consent**

91.     Prevea formed in 1995 in partnership with HSHS to provide health services to patients in Northeastern Wisconsin. Since then, Prevea has worked with HSHS to develop a Prevea-branded website and an electronic medical records system that the companies manage and operate together. In fact, Prevea's terms and conditions represent that HSHS is the entity facilitating and providing Prevea's patient portal access:[5]



92.     The same is true for *all* medical data that Prevea collects online, as HSHS acknowledges that it and Prevea must follow Prevea's Notice of Privacy Practices under federal law:

---

[5] Prevea's MyChart Terms and Conditions are available at https://www.myprevea.com/MyPrevea/Authentication/Login?mode=stdfile&option=termsandconditions (last visited Aug. 27, 2024).



**Notice of Privacy Practices**

***THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.***

Federal law requires Hospital Sisters Health System (HSHS) and our health care providers to maintain the privacy of your Protected Health Information (PHI). We are required by law to give you this notice and to comply with the terms and conditions of the most current notice. We reserve the right to change the terms of this notice and to make the new notice terms apply to all of your PHI we maintain. We will make you aware of our new notice terms by updating our Notice of Privacy Practices posted on our website and at our facility.

93.     Under that policy, Defendants promise never to disclose PHI for "marketing purposes," a commitment they routinely violate by tracking and disclosing patient data to third party advertisers without patient consent:

> ***Marketing and Sales.*** We will obtain your authorization before using your PHI for marketing or sales purposes, as required by law. For example, we will obtain your authorization if we want to use your PHI in an article about the hospital. You may revoke this authorization at any time.

94.     In addition to employing the Meta Pixel to track patients, Prevea's web properties and patient portal used Google Analytics, including Google's Universal Analytics tracker, and Firebase Code to track and disclose patient activity—including Plaintiffs Ward and Bornemann's activity—without their consent. As above, the Firebase SDK code enable Google to collect information such as Plaintiffs Ward and Bornemann's age bracket, gender, interests, device brand, device category, location, operating system, and other information regarding users' interactions with the app. Google Firebase code also allows Google to track text that users type into an app;

21

track results of users' searches within an app; and track users' downloads of files within an app. Unbeknownst to Plaintiffs Ward, Bornemann, and other Prevea patients, the installation of this code inside the Prevea patient portal app resulted in disclosures of patients' personal health information, including their patient status, whenever they logged into the app and used it for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors.

95.    In addition, through Google Analytics, Defendants disclosed Plaintiffs Ward and Bornemann's activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers.  Defendants routinely disclose patients' PII/PHI to Google using this technology.

96.    While defendants have at times claimed that the patient data they routinely shared with Google is "anonymized," those claims are both false and misleading.  For example, the "anonymizing" technology employed by Defendants does not actually prevent Google from linking the patient data it receives to specific patients.  In other words, at no point during the class period was the data being shared with Google ever genuinely "anonymized."  Worse, Defendants' claims to have "anonymized" the patient data it shared with Google were substantially misleading given that the anonymization features were never enabled for some of the tracking technology that Defendants employed and, in other instances, were enabled only sporadically during the class period.

**E.    Tracking pixels provide third parties with a trove of personally identifiable information.**

97.    Tracking pixels are especially pernicious because they result in the disclosure of personally identifiable information.

22

98.    For example, an IP address is a number that identifies a computer connected to the internet.  IP addresses are used to identify and route communications on the internet.  IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content.  IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[6]

99.    Because of their uniquely identifying characteristics, IP addresses are considered PII.[7]  Tracking pixels can (and typically do) collect website visitors' IP addresses.  Likewise, internet cookies also provide personally identifiable information.[8]

100.    In the early years of the internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

101.    Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

102.    Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a

---

[6] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.
[7] 45 C.F.R. § 164.514.
[8] *Id.*

user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

103.    Cookies are considered PII, and tracking pixels can collect cookies from website visitors.[9]

104.    In general, cookies are categorized by (1) duration and (2) party.

105.    There are two types of cookies classified by duration.

106.    "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

107.    "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

108.    Cookies are also classified by the party that uses the collected data.

109.    "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

110.    "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same patient who visits Defendants' websites will also have cookies on their device from third parties, such as Facebook and Google.  Unlike first-party cookies, third-party cookies are not typically

---

[9] *Id*.

24

helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

111.    Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

112.    Traditionally, first party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendants can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendants are not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendants. But data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

113.    JavaScript source code developed by third party data companies and placed on a webpage by developers such as Defendants can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that

is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

114.    In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

115.    The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

116.    The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

117.    Defendants require patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

118.    The _fbp cookie is used as a unique identifier for patients by Facebook.

119.    If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendants with Facebook users.

120.    Defendants engage in cookie synching with Facebook, Google, and other third parties.

26

121.    Defendants' cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Defendants assign to patients to also be made to third parties.

122.    Defendants use and cause the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

123.    A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

124.    These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[10] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[11] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[12]

125.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

---

[10] https://www.blog.google/products/chrome/building-a-more-private-web/.
[11] https://pixelprivacy.com/resources/browser-fingerprinting/.
[12] https://www.blog.google/products/chrome/building-a-more-private-web/.
[13] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

126.    Browser-fingerprints are personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

127.    Defendants use and cause the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

128.    A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the user's personal identity across the internet whenever the identifier is encountered.  A Facebook ID is an identifying number string that is connected to a user's Facebook profile.[14]  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

129.    Unique identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

130.    Each of the individual data elements described above is personally identifiable on their own.  However, Defendants' disclosures of such personally identifiable data elements do not occur in a vacuum.  The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**F.    Facebook's Business Model:  Exploiting Users' Personal Information for Profit.**

131.    Facebook, a social media platform founded in 2004 and today operated by Meta

---

[14] https://www.facebook.com/help/211813265517027
[15] https://smallseotools.com/find-facebook-id/

Platforms, Inc., was originally designed as a social networking website for college students.

132.    Facebook describes itself as a "real identity" platform.[16]  This means that users are permitted only one account and must share "the name they go by in everyday life."[17]  To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[18]

133.    In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19]  Facebook has since evolved into one of the largest advertising companies in the world.[20]  Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[21]  This allows Facebook to make inferences about users based on their interests, behavior, and connections.[22]

134.    Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[23]

135.    Facebook maintains profiles on users that include users' real names, locations,

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[18] https://www.facebook.com/help/406644739431633

[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[22] https://www.facebook.com/business/ads/ad-targeting

[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

136.    Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

137.    Facebook offers several advertising options based on the type of audience that an advertiser wants to target.  Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting."  Each of Facebook's advertising tools allow an advertiser to target users based on, among other things, their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited).  This audience can be created by Facebook, the advertiser, or both working in conjunction.

138.    Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely

to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24]  Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

139.    Defendants knew or should have known that Facebook could not be trusted with its patients' sensitive medical information given its history of violating consumers' privacy through unauthorized use of their personal information in general, and for marketing purposes, specifically.

140.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendants did nothing to protect their patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

141.    Additionally, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

**G.    Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

142.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

143.    One of Facebook's most powerful tools is called the "Meta Pixel."

---

[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

144.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[25] Once activated, the Meta Pixel "tracks the people and type of actions they take."[26] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[27] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[28]

145.    When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[29] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

146.    The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

147.    The transmission is invisible.

148.    The transmission is made without any affirmative action taken by the patient.

149.    The transmission occurs without any notice to the patient that it is occurring.

150.    Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for

---

[25] https://developers.facebook.com/docs/meta-pixel/

[26] https://www.facebook.com/business/goals/retargeting

[27] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[28] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[29] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

151.    The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[30] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them.  Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

152.    These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[31]

153.    For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information like IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook

---

[30] *Id*. at 596.
[31] *Id*. at 596.

33

receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

154.    These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[32]

155.    In exchange for installing its Meta Pixel, Facebook provides website owners like Defendants with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[33]

156.    The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[34]

157.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

158.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[35]  According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take

---

[32] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[33] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[34] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[35] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

on their websites."[36]

159.    Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[37]

160.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[38]

161.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including PII/PHI), as well as "optional values" set by the business website.[39]    Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID.    Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

162.    Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[40]

163.    For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.    The information is sent in data packets, which include personally identifiable data.

[36] https://www.oviond.com/understanding-the-facebook-pixel
[37] https://developers.facebook.com/docs/meta-pixel/get-started
[38] https://developers.facebook.com/docs/meta-pixel/get-started
[39] https://developers.facebook.com/docs/meta-pixel/
[40] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

164. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[41]  HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[42]  Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[43]

165. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID.  Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile.  Facebook stores this information on its servers, and, in some instances, maintains this information for years.[44]

166. Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.  The IP address enables Facebook to keep track of the website page visits associated with that address.

167. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID.  The c_user cookie value is the Facebook equivalent of a user identification number.  Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

168. The data supplied by the c_user cookie allows Facebook to identify the Facebook

---

[41] https://developers.facebook.com/docs/meta-pixel/
[42] https://developers.facebook.com/docs/meta-pixel/
[43] https://developers.facebook.com/docs/meta-pixel/
[44] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

account associated with the cookie.  One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

169.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[45] The fbp cookie, for example, is a Facebook identifier that is set by Facebook source code and associated with Defendants' use of the Facebook Tracking Pixel program.  The fbp cookie emanates from Defendants' web properties but is transmitted to Facebook through cookie synching technology that Facebook employs. These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[46]

170.    Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive.  The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address.  Facebook

---

[45] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-
,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[46] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like Defendants', and target users with advertising based on their web activity.

171.    Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website.  This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[47]   Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising.  Indeed, Facebook utilizes precisely the type of PII/PHI that Defendants bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**D.    Defendants embedded the Meta Pixel tool on their websites, capturing and disclosing patients' PII/PHI to Facebook.**

172.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic.  The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

173.    Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented.   When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook

---

[47] https://www.facebook.com/business/ads/ad-targeting

gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites. Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

174. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[48] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[49] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

175. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[50] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[51]

176. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

177. Facebook has designed the Meta Pixel such that Facebook receives information

---

[48] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[49] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[50] https://instapage.com/blog/meta-pixel
[51] https://instapage.com/blog/meta-pixel

about patient activities on hospital websites as they occur in real time.  Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

178.    Defendants are among the hospital systems who have embedded Meta Pixel on their websites.  Via its use of the Meta Pixel, Defendants intercepted and disclosed the contents of Plaintiffs' and Class Members' communications with Defendants, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Doctor, connect, Login, or Enroll in Defendants' patient portals, summaries of Defendants' responsive communications, the parties to the communications, and the existence of communications at Defendants' websites.

179.    For example, when a patient visited the homepage of Defendants' websites, the source code employed by Defendants cause PII/PHI to be transmitted to Facebook.

180.    Likewise, when a patient enters their PII/PHI through Defendants' websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is immediately and instantaneously routed to Facebook via the Meta Pixel.  The acquisition and disclosure of these communications occurred contemporaneously with the transmission of these communications by patients.

181.    Patient PII/PHI, which can include both sensitive medical information such as health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, as well as personally identifiable information, is obtained and used by Facebook and other third parties as a result of the software that Defendants have installed

on its website and patient portal(s).

182.    For example, a patient searching for a doctor on Defendants' website located at https://www.hshs.org/ is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's preferred location, and other information that the patient provides:



183.    All this data is disclosed to Facebook simultaneously in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts.   Defendants also disclose other personally identifiable information to Facebook, such as patient IP addresses, cookie identifiers, URLs, browser-fingerprints, device identifiers, and other uniquely identifying characteristics and/or codes.

184.    Defendants disclose patient PII/PHI collected across their websites including (but not limited to) the following communications:

    a.    when patients search via Defendants' search bars for their required care (e.g., for "substance abuse");

41

b.      when patients search for a physician or provider—which reveal their location and required medical services and medical conditions (e.g., searching for "Gynecology");

c.      when patients search for, register for, and/or click on classes or events (e.g., "Removing Barriers to Happiness");

d.      when patients research treatment information and medical services; and

e.      when patients select "Locations" and then enter their ZIP code, the medical service they are seeking (e.g., "Behavioral Health"), and required location type (e.g., "Hospital").

185.    In other words, Facebook learns not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendants are not sharing with third party marketing companies. Defendants make similar disclosures to Facebook, Google, and other third parties when patients click on the "Log in" buttons of the password protected portions of its website, including its patient portal and bill pay functions, confirming to these companies that the website users are Defendants' patients.

186.    Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

187.    The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendants' websites.  The path identifies where a file can be found on a website.  For example, a patient reviewing information about the "Services" that Defendants offer patients such "Medical & Surgical Weight Loss Clinic" will generate a URL with the path https://www.hshs.org/sacredheart/services/medical-and-surgical-weight-loss-clinic.

188.    Likewise, a query string provides a list of parameters.  An example of a URL that provides a query string is https://www.hshs.org/search?search=cancer.  The query string parameters in this search indicate that a search was done at Defendants' websites for information about cancer.  In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

189.    Defendants also provide Facebook with details about online forms that patients fill out in the form of POST requests.  All the information that patients provide when filling out these forms are also disclosed to Facebook.

190.    As the above demonstrates, knowing what information a patient is reviewing on Defendants' websites can reveal deeply personal and private information.  For example, a simple search for "pregnancy" on Defendants' websites tells Facebook that the patient is likely pregnant.  Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends.  But there is nothing visible on Defendants' websites that would indicate to patients that, when they use Defendants' search function, their personally identifiable data and the precise content of their communications with Defendants are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

191.    The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendants disclose a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendants' websites, the website returns links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

192.    The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendants' websites. Worse, no matter how sensitive the area of the Defendants' website that a patient reviews, the referral URL is acquired by Facebook along with other PII/PHI.

193.    The nature of the collected data is also important. Defendants' unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendants' websites. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

194.    Defendants also disclose the same kind of patient data described above to other third parties involved in internet marketing, including Google, via tracking software that Defendants have installed on their websites. As with the Facebook Meta Pixel, Defendants provide patients and prospective patients with no notice that Defendants are disclosing the contents of their

44

communications to these third parties.  Likewise, Defendants do not obtain consent from patients and prospective patients before forwarding their communications to these companies.

195.    These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[52] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers.  Defendants routinely disclose patients' PII/PHI to such Google services as Google Analytics.

196.    Google cookies provide personally identifiable data about patients who visit Defendants' websites to Google.  Defendants transmit personally identifiable Google cookie data to Google.

197.    Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

198.    Defendants deploy Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendants and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, payments, and registrations and logins to Defendants' patient portals.

---

[52] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

199.    By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook, Defendants knowingly discloses information that allows Facebook and other advertisers to link their patients' PII/PHI to their private identities and target them with advertising (or do whatever else Facebook may choose to do with their information, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[53]  Defendants intentionally share the PII/PHI of their patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

200.    The information Plaintiffs and Class Members provide to Hospital Sisters via its website (and then shared illegally with Facebook) can be combined with other information in Facebook's possession, like their names, dates of birth, and phone numbers, to more effectively target Plaintiffs with advertisements or sell Plaintiffs' data to third parties.

201.    Because Defendants embedded the Meta Pixel on their websites, Defendants disclosed intimate details about Plaintiffs' interactions with the websites, including Plaintiffs' scrolling, typing, and selecting options from drop down menus.  Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identity.  For example, when Plaintiffs and Class Members visited Defendants' websites, their PII/PHI was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms.  During these same transmissions, Defendants' websites would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class

---

[53] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

202. Defendants knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' PII/PHI, including sensitive medical information and personally identifiable data. Defendants were also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendants made the decision to barter its patients' PII/PHI to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendants and Facebook, it betrayed the rights of Plaintiffs and Class Members.

**H.    Defendants' interception and disclosure of patient communications permits Facebook and other third-party advertising companies to engage in cross-device targeting across multiple devices.**

203. In addition to enabling Defendants to advertise to patients and potential patients on non-Defendants' websites, Defendants' misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses. This is called cross-device targeting.

204. Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices. For example, even if a patient has never visited Defendants' websites on their smartphone, cross-device tracking and marketing allows Defendants and other third parties to target patients on that device. In other words, a patient or potential patient who visited Defendants' websites on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Defendants and other third parties on his smartphone.

205. Defendants' and other third parties' use of cross-device targeting demonstrates that the data Defendants disclose to third parties is personally identifiable because they enable patients

47

to be tracked across multiple devices that patients own—even if a patient has never communicated with Defendants on one or more of their devices.

206.    Defendants have made the decision that access to the targeted advertising (including retargeting and cross-device tracking) that is enabled by its disclosure of patient data and communications is of commercial benefit to Defendants.

207.    Defendants obtain additional revenue from their deployment of third-party tracking tools through which it discloses personally identifiable patient data and communications to third parties, including Google and Facebook.

208.    Any additional revenue that that Defendants obtained from their unauthorized misuse of its own patients' personal health information is unearned and is the rightful property of the patients (including Plaintiffs and Class Members) from whom it was obtained.

**I.    Plaintiffs and the Class Members did not consent to the interception and disclosure of their PII/PHI.**

209.    Plaintiffs and Class Members had no idea when they interacted with Defendants' websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook.  That is because, among other things, Meta Pixel is secretively and seamlessly integrated into Defendants' websites and is invisible to patients visiting those websites.

210.    For example, when Plaintiffs visited HSHS's website at https://www.hshs.org in 2021, there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit their sensitive medical data to Facebook.

211.    Plaintiffs and their fellow Class Members could not consent to Defendants' conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

212.    For example, while HSHS purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried at the bottom of HSHS's homepage:



213.    Moreover, HSHS's "Privacy Policy" gives no indication to patients that HSHS routinely allows Facebook to capture and exploit patients' PII/PHI. Indeed, HSHS expressly promises in its "Privacy Policy" that "We will obtain your authorization before using your PHI for marketing or sales purposes, as required by law."[54]

214.    This statement is false, deceptive, and misleading because HSHS, in fact, tracks patients' and potential patients' IP addresses, cookies, browser-fingerprints, and device identifiers, which it then causes the transmission of the same to third parties along with patients' and potential patients' sensitive medical information.

215.    HSHS also promises patients that "We will ask for your **written authorization**

---

[54] https://www.hshs.org/HSHS/notice-of-privacy-practices

before using or disclosing your PHI for situations not described in this notice."[55]

216.    This statement is also false, deceptive, and misleading because HSHS—without providing any notice to its patients in its privacy policy or otherwise—routinely sells and/or barters its patients' personal health information to Facebook without patients' knowledge or consent in return for access to the Meta Pixel tool.

217.    Likewise, HSHS makes multiple other false and misleading statements in its privacy policies, including

(a) "We do not sell or license your information."

(b) "We respect your privacy."

(c) "We do not use cookies to retrieve information from Your computer or device for purposes that are unrelated to Our Site or Your interaction with Our Site."

(d) "We do not use or disclose sensitive personal information … without Your express consent."

(e) "We … will not directly provide Your personally identifiable information to [our] strategic partners for promotional purposes."

218.    These statements are also false, deceptive, and misleading because HSHS—without providing any notice to its patients in its privacy policy or otherwise—routinely sells and/or barters its patients' personal health information to Facebook without patients' knowledge or consent in return for access to the Meta Pixel tool.

219.    So too for Prevea's Notice of Privacy Practices, which misrepresents Prevea's tracking and disclosure activity.[56]

220.    What's more, the very term "Privacy Policy" is deceptive.    Research has

---

[55] https://www.hshs.org/HSHS/notice-of-privacy-practices (emphasis added).
[56] Find Prevea's Notice of Privacy Practices at https://www.prevea.com/getmedia/63c7f21f-e2f3-4706-89df-8db27bf6ccae/Privacy-Practices-Notice-(English).pdf (last visited Aug. 27, 2024).

consistently shown that a majority of Americans who see that a website has a "Privacy Policy" falsely believe that the company with the policy cannot (and will not) disclose information about them to third parties without their consent.

221. Defendants do not have a legal right to share Plaintiffs' and Class Members' PII/PHI without their written consent to third parties, because this information is protected from such disclosure by law. C.F.R. § 164.508. Nor are Defendants permitted to disclose patients' PII/PHI to advertising and marketing companies like Facebook without express written authorization from patients. 45 C.F.R. § 164.502(a)(5)(ii).

222. Indeed, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting individually identifiable health information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data.[57] Among other things, the HHS warned hospitals like Defendants that "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."

223. Defendants failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

224. A patient's reasonable expectation that their health care provider will not share their

---

[57] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Further, Defendants expressly promised Plaintiffs and Class Members that they would never sell or use their PII/PHI for marketing purposes without express authorization.

225.    Defendants violated their own privacy policies by unlawfully intercepting and disclosing Plaintiffs' and Class Members' PII/PHI to Facebook and other third parties without disclosing such activity and without obtaining patients' written consent to share such information.

226.    Accordingly, Defendants lacked authorization to intercept, collect, and disclose Plaintiffs' and Class Members' PII/PHI to Facebook or aid in the same.

**J.    Defendants' disclosures of patients' data to Facebook are unnecessary.**

227.    There is no information anywhere on the websites operated by Defendants that would have alerted patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient PII/PHI to Facebook necessary for Defendants to maintain its healthcare website or provide medical services to patients.

228.    For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments.  It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' PII/PHI to companies like Facebook.  Likewise, it is possible for Defendants to provide medical services to patients without sharing their PII/PHI with Facebook so that this information can be exploited for advertising purposes.

229.    Despite these possibilities, Defendants willfully chose to implement Meta Pixel on their websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendants, to

Facebook.

**K.     Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI—especially with respect to their sensitive medical information.**

230.     Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, including personally identifiable data and sensitive medical information.  Defendants' surreptitious interception, collection, and disclosure of patients' PII/PHI to Facebook violated Plaintiffs and Class Members' privacy interests.

231.     As a patient, Plaintiffs had a reasonable expectation of privacy that her health care provider and its associates would not disclose her PII/PHI to third parties without her express authorization.

232.     The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[58]  Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.  For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care.  However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust….Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[59]

233.     The AMA's ethics opinions have further cautioned physicians and hospitals that

---

[58] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html
[59] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

"[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship."[60]

234.    Plaintiffs' and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Defendants' status as health care providers, Defendants' common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendants' express and implied promises of confidentiality.

235.    It was reasonable for Plaintiffs and Class Members to assume that Defendants' privacy policies were consistent with Defendants' duties to protect the confidentiality of patients' PII/PHI.

236.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable.  Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.  As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[61]

237.    Many privacy law experts have expressed serious concerns about patients' sensitive

---

[60] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).
[61] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's PII/PHI disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**L.    Defendants harmed Plaintiffs when they illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI—which, after all, is Plaintiffs' property and has economic value.**

238.    It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendants have collected and disclosed from Plaintiffs and Class Members.

239.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[62]

240.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[63]  That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[64]

241.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[65]  This price is only increasing. According to Facebook's own financial statements,

---

[62] https://ig.ft.com/how-much-is-your-personal-data-worth/
[63] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[64] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[65] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[66]

242.    Despite the protections afforded by law, there is an active market for health information.   Medical information obtained from health providers garners substantial value because it is generally unavailable to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[67]

243.    Further, individuals can sell or monetize their own data if they so choose.   For example, Facebook has offered to pay individuals for their voice recordings,[68] and has paid teenagers and adults up to $20 per month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[69]

244.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[70]

245.    Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendants have deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook without consideration for Plaintiffs and the Class Member's property.

---

[66] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[67] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[68] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununcitations-app
[69] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[70] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

**M.    Defendants unlawfully enriched themselves when they disclosed patient PII/PHI unnecessarily and without patient authorization.**

246.    In exchange for disclosing PII/PHI about its patients, Defendants are compensated by companies like Google and Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

247.    Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels.  Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

248.    For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website.  Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network.  The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

249.    Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendants lose the ability to control how that information is subsequently disseminated and exploited.

250.    The monetization of the data being disclosed by Defendants, both by Defendants and Facebook, demonstrates the inherent value of the information being collected.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

251.    The applicable statutes of limitation have been tolled because of Defendants' knowing and active concealment and denial of the facts alleged herein.

252.    Defendants seamlessly incorporated trackers into their websites, providing no indication to users that they were being tracked. Defendants had knowledge that its websites incorporated tracking technologies yet failed to disclose that by interacting with tracking-enabled

websites that Plaintiffs' and Class Members' PII/PHI would be intercepted, collected, used by, and disclosed to third parties.

253.    Plaintiffs and Class Members could not, with due diligence, discover the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta's Pixel or other tracking technologies.

254.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendants' illegal interception and disclosure of patients' PII/PHI has continued unabated through the date of the filing of Plaintiffs' complaint. What's more, Defendants were under a duty to disclose the nature and significance of its data collection practices but did not do so.  Defendants are therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

255.    Plaintiffs bring this class action under Rule 23 individually and on behalf of all members of the following Class and subclasses:

> **Nationwide Class:** During the fullest period allowed by law, all current individuals who are current or former patients of Hospital Sisters (or any of Hospital Sisters' affiliates) and Prevea who exchanged communications on Hospital Sisters and Prevea's websites and any other website affiliated with Hospital Sisters and Prevea.

> **Wisconsin Subclass**: During the fullest period allowed by law, all current Wisconsin citizens who are current or former patients of Hospital Sisters (or any of Hospital Sisters' affiliates) and Prevea who exchanged communications on Hospital Sisters and Prevea's websites and any other website affiliated with Hospital Sisters and Prevea.

> **Illinois Subclass**: During the fullest period allowed by law, all current Illinois citizens who are current or former patients of Hospital Sisters (or any of Hospital Sisters' affiliates) and who

exchanged communications at Hospital Sisters' websites and any other website affiliated with Hospital Sisters

256. Excluded from the Class and subclasses are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendant officer or director, and any successor or assign; any Judge who adjudicates this case, including their staff and immediate family; persons who properly execute and file a timely request for exclusion from the Class or subclasses; persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; Plaintiffs' counsel and Defendants' counsel; and the legal representatives, successors, and assigns of any such excluded persons.

257. Plaintiffs reserve the right to amend the class definitions.

258. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

259. Plaintiffs and the Class and subclasses Members satisfy the numerosity, commonality, typicality, adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 23.

260. <u>Numerosity</u>. The Class and subclass members are so numerous that joinder of all members is impracticable. Upon information and belief, the proposed classes include at least thousands of members. The precise number of class and subclass can be determined information in Defendants' custody and control.

261. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of other Class and subclasses Members as they share substantially the same interests in this matter. The claims of Plaintiffs and all class members arise out of—and are based on—the same set of facts and Defendants' wrongful conduct and unauthorized disclosures. Plaintiffs and class members are all current or former

patients of Defendants who used Defendants' websites and thus are victims of Defendants' unauthorized disclosures to third parties.

262.    <u>Adequacy</u>. Plaintiffs, along with their Counsel, will fairly and adequately protect the proposed classes' common interests. Their interests do not conflict with class or subclasses members' interests. And Plaintiffs are committed to prosecuting this action and have retained counsel—including lead counsel—that is experienced in class actions and complex civil litigation. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members. Plaintiffs have no disabling conflicts with Class Members.

263.    Plaintiffs satisfies the requirements for maintaining a class action under Rule 23.

264.    <u>Commonality and Predominance</u>. Plaintiffs and the classes' claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual class members. Thus, a class action will generate common answers apt to drive resolution. In particular, a class action is necessary to answer the following questions:

      a.    if Defendants' acts and practices violated Plaintiffs' and Class Members' privacy rights;

      b.    if Defendants' acts and practices violate Wisconsin or Illinois law;

      c.    if Defendants knowingly allowed the surreptitious collection and disclosure of Plaintiffs' and Class Members' PII/PHI to third parties;

      d.    if Defendants' acts and practices constitute a breach of fiduciary duty;

      e.    if Defendants profited from disclosures of patient PII/PHI to third parties;

      f.    if Defendants were unjustly enriched;

      g.    if Defendants' and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

     h.     if Defendants' and practices were intentional;

     i.     if Defendants profited from disclosures of Plaintiffs' and Class Members' PII/PHI to third parties;

     j.     if Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

     k.     if Plaintiffs and Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

265.    Superiority. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts and thus establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

266.    Plaintiffs also satisfies the requirements for maintaining a class action under Rule 23 because the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of

conduct for Defendants, and because the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

267.    Plaintiffs also satisfies the requirements for maintaining a class action under Rule 23 because Defendants have acted or refused to act on grounds that apply generally to the proposed Class, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Class as a whole.

268.    Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendants, electronically or by publication, the cost of which is properly imposed on Defendants.

**FIRST CAUSE OF ACTION**
**Federal Wiretapping Act**
**(On Behalf of Plaintiffs and the Nationwide Class Against all Defendants)**

269.    Plaintiffs incorporate all allegations above to the below. Plaintiffs Brahm, Quaid and Doe allege this claim against HSHS only, while Plaintiffs Ward and Bornemann allege this claim against HSHS and Prevea.

270.    The Electronic Communications Privacy Act, 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

271.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that

the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

272.    Plaintiffs' communications with Defendants on their web properties and patient portal are covered communications under the Wiretap Act.

273.    Plaintiffs' and Class Members' communications with Defendants constitute "electronic communications" because each communication was the transfer of data or intelligence, including, but not limited to:

    a.  the parties to the communications;

    b.  the precise text of patient search queries;

    c.  personally identifiable information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

    d.  the precise text of patient communications about specific doctors;

    e.  the precise text of patient communications about specific medical conditions;

    f.  the precise text of patient communications about specific treatments;

    g.  the precise text of patient communications about scheduling appointments with medical providers;

    h.  the precise text of patient communications about billing and payment;

    i.  the precise text of specific buttons on Defendants' website(s) that patients click to exchange communications, including Logins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Defendants' website(s);

k. the precise dates and times when patients visit Defendants' websites;

l. information that is a general summary or informs third parties of the general subject of communications that Defendants send back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Defendants have aided third parties in scraping from webpages or communication forms at web properties.

274. Plaintiffs and Class Members' communications with Defendants constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendants' computer servers; and

g. Third-party source code used by Defendants;

275. Whenever Plaintiffs and Patient Class members interacted with Defendants' web properties, including their MyChart patient portals, Defendants, through the source code they imbedded and ran on their web properties, contemporaneously and intentionally divulged the contents of Plaintiffs and Class members' electronic communications while those communications

were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

276.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

277.    Thus, although Defendants are "parties to the communications" at issue, they still incur liability under the ECPA because it captured and redirected Plaintiffs' information to third parties without consent and for criminal and tortious purposes, as alleged throughout this complaint. Indeed, Defendants intercepted patients' electronic communications for the purposes of making disclosures that violated HIPAA, 42 U.S.C. § 1320d-6(a)(3) (criminal wrongful disclosure of individually identifiable health information), as well as state tort law, then bartered away patients' PII/PHI to third parties like Facebook and Google for marketing and advertising benefits.

278.    As a result, Defendants harmed Plaintiffs and the Class, violating their privacy, breaching their contract with the hospital, depriving them the full benefit of their bargain with Defendants for care, and causing actual damages in an amount to be proven at trial.

279.    For these reasons, Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiffs, the Nationwide Class, and State Subclasses Against all Defendants)**

280.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein. Plaintiffs Brahm, Quaid and Doe allege this claim against HSHS only, while Plaintiff Ward and Bornemann allege this claim against HSHS and Prevea.

281.    Defendants solicited and invited Plaintiffs and Class Members to provide their PII/PHI on their websites as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their PII/PHI to Defendants as part of acquiring Defendants' medical services. Per their contractual, legal, ethical, and fiduciary duties, Defendants were obligated to take adequate measures to protect Plaintiffs and Class Members' PII/PHI from unauthorized disclosure to third parties such as Facebook. These facts give rise to the inference that Defendants took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

282.    Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendants when they sought medical treatment from Defendants. Specifically, through their course of conduct, Defendants, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendants to retain and protect the privacy of Plaintiffs' and Class Members' PII/PHI.

283.    Defendants required and obtained Plaintiffs' and Class Members' PII/PHI as part of the physician-patient relationship, evincing an implicit promise by Defendants to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' PII/PHI. Defendants, through their privacy policies, codes of conduct, company security practices, and other conduct, implicitly promised that it would safeguard Plaintiffs' and Class Members' PII/PHI in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

284.    Implied in the exchange was a promise by Defendants to ensure that the PII/PHI of Plaintiffs and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiffs and Class Members.  By asking for and obtaining Plaintiffs and Class Members' PII/PHI, Defendants assented to protecting the confidentiality of that information.  Defendants' implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' PII/PHI was necessary to effectuate the contract between the parties.

285.    Plaintiffs and Class Members provided their PII/PHI in reliance on Defendants' implied promise that this information would not be shared with third parties without their consent.

286.    These exchanges constituted an agreement and meeting of the minds between the parties:  Plaintiffs and Class Members would provide their PII/PHI in exchange for the medical treatment and other benefits provided by Defendants (including the protection of their confidential personal and medical information).  A portion of the price of each payment that Plaintiffs and the Class Members made to Defendants for medical services was intended to ensure the confidentiality of their PII/PHI.

287.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants would comply with their promises to protect the confidentiality of their PII/PHI as well as applicable laws and regulations governing the disclosure of such information and that Defendants would not allow third parties to collect or exploit their communications with Defendants without their consent.

288.    It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their PII/PHI to Defendants but for the prospect of Defendants' promise of medical treatment and other benefits.

289.    Defendants were therefore required to reasonably safeguard and protect the PII/PHI of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

290.    Plaintiffs and Class Members accepted Defendants' medical services offer and fully performed their obligations under the implied contract with Defendants by providing their PII/PHI to Defendants among other obligations.  Plaintiffs and Class Members would not have provided and entrusted their PII/PHI to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their PII/PHI for uses other than the benefits offered by Defendants.

291.    Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' PII/PHI were material aspects of these implied contracts.

292.    Additionally, Defendants' express representations, including, but not limited to the express representations found in their Privacy Policies and Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendants refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' PII/PHI without consent.

293.    Defendants also materially breached their contractual obligation to protect Plaintiffs' and Class Members' non-public PII/PHI when they failed to implement adequate security measures and policies to protect the confidentiality of that information.  Defendants

294.    As a result of Defendants' failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at

least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

295.    As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their PII/PHI, the loss of control of their PII/PHI, the diminution in value of their PII/PHI, and the loss of the benefit of the bargain they had struck with Defendants.

296.    Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

**THIRD CAUSE OF ACTION**
**Violations of Wis. Stat. § 968.31**
**(Interception and disclosure of wire, electronic or oral communications prohibited)**
**(On Behalf of Plaintiffs Brahm, Ward, Bornemann and**
**the Wisconsin Subclass Against all Defendants)**

297.    Plaintiffs Brahm, Ward, and Bornemann incorporate by reference all other paragraphs as if fully set forth herein. Plaintiff Brahm asserts this claim against HSHS only, while Plaintiffs Ward and Bornemann assert it against HSHS and Prevea.

298.    All conditions precedent to this action have been performed or have occurred.

299.    Wis. Stat. § 968.31 prohibits the interception and disclosure of wire, electronic or oral communications. Specifically, under Wis. Stat. § 968.31(1), the following acts are prohibited:

a.    "Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication."

b.    "Intentionally uses, attempts to use or procures any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication."

c.    "Discloses, or attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

d.    "Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

300.    Defendants intercepted Plaintiffs' and Class Members' electronic communications for the purpose of committing multiple tortious acts, including, but not limited to, the criminal and tortious acts specified below.

301.    For example, Defendants intercepted Plaintiffs' and Class Members' electronic communications for the purpose of disclosing those communications to third parties without the knowledge, consent, or written authorization of Plaintiffs or Class Members.

302.    Defendants' misconduct falls within the ambit of Wisconsin's wiretapping statute because the disclosure of Plaintiffs and Class Members' PII/PHI to third parties—without consent or proper authorization—is an illegal or tortious act that violates multiple laws, including (but not limited to) Wis. Stat. § 995.50. Further, as set forth *supra* and *infra*, Defendants'

interception and disclosure of Plaintiffs and Class Members' electronic communication commits, under Wisconsin law, the torts of conversion and breach of fiduciary duty.

303.    Wis. Stat. § 968.31(2m) provides that "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of ss. 968.28 to 968.37 shall have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose, or use, the communication."

304.    Defendants qualify as persons under the statute.

305.    Under Wis. Stat. § 968.27, Wisconsin defines "electronic communications" to mean "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature wholly or partially transmitted by a wire, radio, electromagnetic, photoelectronic or photooptical system." Plaintiffs and Class Members' communications with Defendants constitute "electronic communications" under Wisconsin law.

306.    Plaintiffs and Class Members' communications with Defendants constitute "electronic communications" because each communication was the transfer of data or intelligence, including, but not limited to:

       a.    the parties to the communications;

       b.    the precise text of patient search queries;

       c.    personally identifiable information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

       d.    the precise text of patient communications about specific doctors;

       e.    the precise text of patient communications about specific medical conditions;

       f.    the precise text of patient communications about specific treatments;

g.  the precise text of patient communications about scheduling appointments with medical providers;

h.  the precise text of patient communications about billing and payment;

i.  the precise text of specific buttons on Defendants' website(s) that patients click to exchange communications, including Logins, Registrations, Requests for Appointments, Search, and other buttons;

j.  the precise dates and times when patients click to Log-In on Defendants' website(s);

k.  the precise dates and times when patients visit Defendants' websites;

l.  information that is a general summary or informs third parties of the general subject of communications that Defendants send back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m.  any other content that Defendants have aided third parties in scraping from webpages or communication forms at web properties.

307.  Plaintiffs and Class Members' communications with Defendants constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including Defendants.

308.  No legitimate purpose was served by Defendants' willful and intentional disclosure of Plaintiffs and Class Members' PII/PHI to third parties.  Neither Plaintiffs nor Class Members consented to the disclosure of their PII/PHI by Defendants to third parties.  Nor could they have consented, given that Defendants never sought Plaintiffs or Class Members' consent, or even told

visitors to its website that their every interaction was being recorded and transmitted to third parties with personally identifiable information.

309.    Plaintiffs and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their PII/PHI, including using their sensitive medical information to develop marketing and advertising strategies.

310.    Under Wis. Stat. § 968.31(2m), aggrieved persons are entitled to: "(a) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) Punitive damages; and (c) A reasonable attorney's fee and other litigation costs reasonably incurred."

311.    In addition to statutory damages, Defendants' breach caused Plaintiffs and Class Members the following damages:

      a.    sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

      b.    Defendants eroded the essential confidential nature of the doctor-patient relationship;

      c.    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

312.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## FOURTH CAUSE OF ACTION
### Breach of the Duty of Confidentiality

73

**(On Behalf of Plaintiffs Brahm, Ward, Bornemann and
the Wisconsin Subclass Against all Defendants)**

313.    Plaintiffs Brahm, Ward, and Bornemann incorporate by reference all other paragraphs as if fully set forth herein. Plaintiff Brahm asserts this claim against HSHS only, while Plaintiffs Ward and Bornemann assert it against HSHS and Prevea.

314.    As the Wisconsin Supreme Court recognized in *Steinberg v. Jensen*, 194 Wis.2d 439, 465 (Wis.,1995), "Physicians owe an ethical duty of confidentiality to their patients." This ethical duty owed by physicians is generally set forth in the Hippocratic Oath, the American Medical Association's Principles of Medical Ethics, and the Current Opinions of the Judicial Counsel of the American Medical Association. *Id.* This ethic duty prohibits doctors from disclosing confidential information about their patients without their patients' consent.

315.    Given the doctor-patient relationship between Defendants and Plaintiff and Class members, where Defendants provided healthcare and became the guardian of their PII/PHI, Defendants owed Plaintiffs and Class Members a duty to act for the benefit of Plaintiffs and Class members by (a) safeguarding Plaintiffs and Class members' PII/PHI, (b) not disclosing Plaintiffs and Class members' PII/PHI without their consent, and (c) notifying in a timely manner Plaintiffs and Class members in the event of the unauthorized disclosure of their PII/PHI.

316.    Because of the overly sensitive nature of the PII/PHI, Plaintiffs and Class members would not have entrusted Defendants with their PII/PHI had they known that Defendants would disclose—without consent—patient PII/PHI to third parties.

317.    Defendants breached their ethical duties of confidentiality to Plaintiffs and Class members by (a) failing to safeguard Plaintiffs and Class members' PII/PHI, (b) disclosing Plaintiffs and Class members' PII/PHI, without their authorization or consent, to third parties, and

(c) failing to notify Plaintiffs and Class members that their PII/PHI was disclosed, without their authorization or consent, to third parties.

318.    As a direct and proximate result of Defendants' breach of its fiduciary duties, Plaintiffs and Class members have suffered and will continue to suffer numerous injuries (as detailed above).

## FIFTH CAUSE OF ACTION
**Invasion of Privacy, Public Disclosure**
**(On Behalf of Plaintiffs, the Nationwide Class, and State Subclasses Against all Defendants)**

319.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein. Plaintiffs Brahm, Quaid and Doe allege this claim against HSHS only, while Plaintiffs Ward and Bornemann allege this claim against HSHS and Prevea.

320.    Wisconsin recognizes the tort of invasion of privacy. Specifically, Wis. Stat. § 995.50(2)(am)(3) defines "invasion of privacy" as "[p]ublicity given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the Defendants has acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter involved, or with actual knowledge that none existed."

321.    Illinois also recognizes the claim under common law principles that match those in Wisconsin. *See Johnson v. K Mart Corp.*, 311 Ill. App. 3d 573, 579, 723 N.E.2d 1192, 1197, 243 Ill. Dec. 591 (2000).

322.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

323.    Defendants owed a duty to its patients, including Plaintiffs and the Class, to keep this information confidential.

324.    The unauthorized disclosure of PII/PHI to third parties is highly offensive to a reasonable person.

325.    Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

326.    Defendants' disclosures to third parties constitutes intentional interference with Plaintiffs and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

327.    Defendants acted with a knowing state of mind when it used software tools specifically designed to automatically disclose patient PII/PHI to third parties.

328.    Defendants acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the unauthorized disclosures, thereby materially impairing their mitigation efforts.

329.    Acting with knowledge, Defendants had notice and knew that it would injure Plaintiffs and the Class by using software tools specifically designed to automatically disclose patient PII/PHI to third parties.

330.    As a proximate result of Defendants' acts and omissions, Plaintiffs' and Class Members' PII/PHI were disclosed to third parties—and is now available for further disclosure and redisclosure without authorization, further inflicting injuries on Plaintiffs and the Class (as detailed *supra*).

331.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to inflict irreparable injury to Plaintiffs and the Class since Defendants, upon information and belief, continues to disclose patient PII/PHI to third parties without patient authorization or consent.

332.    Under Wis. Stat. § 995.50(1), Plaintiffs and Class Members are entitled to: (a) equitable relief to prevent and restrain such invasion, (b) compensatory damages based either on Plaintiffs' loss or Defendants' unjust enrichment, and (c) reasonable attorney fees.

333.    Plaintiffs and the Class have no adequate remedy at law for the ongoing injuries relating to Defendants' continued possession and disclosure of their PII/PHI. A judgment for monetary damages will not end Defendants' practice of disclosing patient PII/PHI to third parties without patient authorization or consent.

### SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs, the Nationwide Class, and State Subclasses Against all Defendants)**

334.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein. Plaintiffs Brahm, Quaid, and Doe allege this claim against HSHS only, while Plaintiffs Ward and Bornemann allege this claim against HSHS and Prevea.

335.    This claim is pleaded in the alternative to the breach of implied contract claim.

336.    Plaintiffs and Class Members personally and directly conferred a benefit on Defendants by paying Defendants for health care services, which included Defendants' obligation to protect Plaintiffs and Class Members' PII/PHI. Defendants were aware of receiving these payments from Plaintiffs and Class Members and demanded such payments as a condition of providing treatment.

337.    Plaintiffs and Class Members also personally and directly conferred a benefit on Defendants in the form of valuable and sensitive medical information that Defendants collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendants collected, used, and disclosed this information for their own gain, including for advertising purposes, sale, and/or trade for valuable services from third parties.  Defendants had knowledge

that Plaintiffs and Class Members had conferred this benefit on Defendants by interacting with its website, and Defendants intentionally installed the Meta Pixel tool on its website to capture and monetize this benefit conferred by Plaintiffs and Class Members.

338.    Plaintiffs and the Class Members would not have used the Defendants' services, or would have paid less for those services, if they had known that Defendants would collect, use, and disclose their PII/PHI to third parties.

339.    Defendants unjustly retained the benefits conferred on them by Plaintiffs and Class Members at their expense because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

340.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**SEVENTH CAUSE OF ACTION**
**Illinois Eavesdropping Statute, 720 ILCS § 5/14-1**
**(On behalf of Plaintiffs Quaid and Doe and the Illinois Subclass Against HSHS Only)**

341.    Plaintiffs Quaid and Doe incorporate all paragraphs above to the below allegations.

342.    The Illinois Eavesdropping Statute ("IES"), 720 ILCS § 5/14-1, et seq., prohibits the surreptitious interception, recording, or transcription of private electronic communications without the consent of all parties to the conversation and provides a civil cause of action to a person subjected to a violation of the IES against eavesdroppers and their principals.

343.    Under 720 ILCS § 5/14-2(a)(3), the IES makes it unlawful for a person to knowingly and intentionally intercept, record, or transcribe, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication.

344.    Under 720 ILCS § 5/14-2(a)(4), the IES makes it unlawful for a person to knowingly and intentionally "possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of" the IES.

345.    Facebook, Google, and other third-party advertisers were not parties to Plaintiffs' private electronic communications with HSHS. Plaintiffs believed they were only communicating with HSHS, intended for their communications to be directed at HSHS only, and were unaware of the presence of concealed source code that redirected their communications.

346.    HSHS did so without Plaintiffs' consent and for illegitimate, tortious, and criminal purposes, as alleged above. For HSHS's violations of the IES, Plaintiffs and Class members seek all statutory relief, actual damages, punitive damages, injunctive relief, and any other relief the Court deems just.

## PRAYER FOR RELIEF

Plaintiffs and Class members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing her counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.      Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.      Awarding Plaintiffs and the Class damages including applicable statutory, compensatory, consequential, nominal, exemplary, punitive, and actual damages, as allowed by law;

E.      Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F.      Awarding attorneys' fees and costs, as allowed by law;

G.      Awarding prejudgment and post-judgment interest, as provided by law;

H.      Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.      Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demands a jury trial for all claims so triable.

Date: September 20, 2024

Respectfully submitted,

By: /s/ Alex Phillips _____

**STRAUSS BORRELLI PLLC**
Alex Phillips SBN 1098356
Raina Borrelli*
980 N. Michigan Ave., Ste 1610
Chicago, Illinois 60611
raina@straussborrelli.com
aphillips@straussborrelli.com

**AHMAD, ZAVITSANOS, & MENSING, PLLC**
Foster C. Johnson*
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
fjohnson@azalaw.com
dwarden@azalaw.com

\* Admitted Pro Hac Vice

*Attorneys for Plaintiffs and Proposed Class*